Nos. 18-15499, 18-15502, 18-15503, 18-16376

# United States Court Of Appeals

## FOR THE NINTH CIRCUIT

◆◆◆

| | |
|---|---|
| COUNTY OF SAN MATEO,<br>Plaintiff-Appellee,<br>v.<br>CHEVRON CORPORATION, *et al.,*<br>Defendants-Appellants | No. 18-15499<br>No. 17-cv-4929-VC<br>N.D. Cal., San Francisco<br>Hon. Vince Chhabria |
| COUNTY OF IMPERIAL BEACH,<br>Plaintiff-Appellee,<br>v.<br>CHEVRON CORPORATION, *et al.,*<br>Defendants-Appellants | No. 18-15502<br>No. 17-cv-4934-VC<br>N.D. Cal., San Francisco<br>Hon. Vince Chhabria |
| COUNTY OF MARIN,<br>Plaintiff-Appellee,<br>v.<br>CHEVRON CORPORATION, *et al.,*<br>Defendants-Appellants | No. 18-15503<br>No. 17-cv-4935-VC<br>N.D. Cal., San Francisco<br>Hon. Vince Chhabria |
| COUNTY OF SANTA CRUZ, *et al.*,<br>Plaintiff-Appellee,<br>v.<br>CHEVRON CORPORATION, *et al.,*<br>Defendants-Appellants | No. 18-16376<br>Nos. 18-cv-00450-VC;<br>18-cv-00458-VC;<br>18-cv-00732-VC<br>N.D. Cal., San Francisco<br>Hon. Vince Chhabria |

**BRIEF OF AMICI CURIAE ROBERT BRULE, CENTER FOR CLIMATE INTEGRITY, JUSTIN FARRELL, BENJAMIN FRANTA, STEPHAN LEWANDOWSKY, NAOMI ORESKES, and GEOFFREY SUPRAN IN SUPPORT OF APPELLEES AND AFFIRMANCE**

DANIEL P. MENSHER
ALISON S. GAFFNEY
**KELLER ROHRBACK L.L.P.**

1201 THIRD AVENUE, SUITE 3200
SEATTLE, WA 98101-3052
Tel:  (206) 623-1900

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................1

IDENTITY AND INTEREST OF AMICUS CURIAE ...........................2

INTRODUCTION...................................................................................1

I.     DEFENDANTS HAD ACTUAL KNOWLEDGE
OF THE RISKS ASSOCIATED WITH THEIR
FOSSIL FUEL PRODUCTS ....................................................3

    A.     Defendants had early knowledge that fossil
fuel products were causing an increase in
atmospheric $CO_2$ concentrations, and that
this increase could result in "catastrophic"
consequences. .............................................................3

    B.     Defendants conducted their own climate
science research that confirmed fossil fuels
were increasing atmospheric carbon dioxide
and affecting the climate. ...........................................9

II.     DEFENDANTS TOOK PROACTIVE STEPS TO
CONCEAL THEIR KNOWLEDGE AND
DISCREDIT CLIMATE SCIENCE...................................16

    A.     Defendants developed sophisticated
strategies to hide the risks of climate
change and create doubt about the scientific
consensus of global warming. ...................................17

    B.     Defendants engaged in public
communications campaigns designed to
manufacture doubt and minimize the risks
of climate change......................................................22

    C.     Defendants funded organizations and
research to discredit the growing body of
publicly available climate science............................30

i

III.  DEFENDANTS MOVED TO PROTECT THEIR
      OWN ASSETS FROM CLIMATE IMPACTS
      BASED ON THE SCIENCE THEY PUBLICLY
      DISCREDITED ...................................................................... 33

IV.  CONCLUSION .................................................................... 36

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Modesto Redevelopment Agency v. Superior Court,*
  119 Cal. App. 4th 28 (2004) ................................................................. 1

*City of Modesto v. Dow Chem. Co.,*
  19 Cal. App. 5th 130 (2018) ...................................................................2

*County of Santa Clara v. Atlantic Richfield Co.,*
  137 Cal. App. 4th 292 (2006) .................................................................2

*People v. ConAgra Grocery Prods. Co.,*
  17 Cal. App. 5th 51 (2017) .....................................................................2

*Stevens v. Parke, Davis & Co.,*
  9 Cal. 3d 51 (1973) ...............................................................................2

**Other Authorities**

*2007 Corporate Citizenship Report,* ExxonMobil (2007) ........................ 32

Amy Lieberman and Susanne Rust, *Big Oil braced for global
  warming while it fought regulations,* Los Angeles Times
  (Dec. 31, 2015)......................................................................... 34, 35, 36

Amy Westervelt, *Drilled: A True Crime Podcast about
  Climate Change,* Episode 1, The Bell Labs of Energy (Nov.
  14, 2018).................................................................................... 8, 10

*AQ-9 Task Force Meeting Minutes,* American Petroleum
  Institute (Mar. 18, 1980) .......................................................... 11, 12

Benjamin Franta, *Early oil industry knowledge of CO2 and
  global warming,* 8 Nature Climate Change 1024 (Nov. 19,
  2018)........................................................................................4

Benjamin Franta, *Shell and Exxon's secret 1980s climate
  change warnings,* The Guardian (Sept. 19, 2018)...........................16

iii

Dick Russell and Robert F. Kennedy, Jr., *Horsemen of the Apocalypse: The Men Who Are Destroying the Planet* (Hot Books 2017) ....................................................................................... 30

Edward Teller, *Energy patterns of the future*, 38 Energy and Man: A Symposium 53 (1960) ............................................................. 5

Elmer Robinson and R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*, Stanford Research Institute (1968) ..................................................................... 6

*Environmental Research, A Status Report*, American Petroleum Institute (Jan. 1972) .......................................................... 7

*Evolution of Mobil's Public Affairs Programs 1970-81*, Mobil .............. 24

*Exxon and Mobil Ads*, Polluter Watch ...................................................... 24

*ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist Organizations*, UCS (2017) ........................................................................................... 31, 33

Frank Ikard, *Meeting the challenges of 1966*, Proceedings of the American Petroleum Institute (1965) ...................................... 5, 6

Geoffrey Supran and Naomi Oreskes, *Assessing ExxonMobil's climate change communications (1977–2014)*, 12(8) Environmental Research Letters 084019 (Aug. 23, 2017) ........................................................................... 9, 25

*Global Climate Coalition: An Overview*, Global Climate Coalition (Nov. 1996) ........................................................................ 20

*Global Climate Science Communications Team Action Plan*, American Petroleum Institute (Apr. 3, 1998) ........................ 27, 28, 29

*Global Mean CO2 Mixing Ratios (ppm): Observations*, NASA Goddard Institute for Space Studies .................................................. 7

iv

*Global warming: who's right? Facts about a debate that's turned up more questions than answers*, Exxon Corporation (1996) ..................................................................23

*Greenhouse Effect: Shell Anticipates A Sea Change*, New York Times (Dec. 20, 1989) ...........................................................34

H.R. Brannon, A.C. Daughtry, D. Perry, W.W. Whitaker, and M. Williams, *Radiocarbon evidence on the dilution of atmospheric and oceanic carbon by carbon from fossil fuels*, 38 Trans. Am. Geophys. Union 643 (Oct. 1957) ........................ 4

James Osborne, *INTERVIEW: Former Exxon scientist on oil giant's 1970s climate change research*, Dallas News (Oct. 2015) ...........................................................................8

John Walsh, *Exxon Builds on Basic Research*, 225 Science 1001 (1984) .................................................................... 10

Kathy Mulvey and Seth Shulman, *The Climate Deception Dossiers: Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation*, Union of Concerned Scientists (July 2015) ........................................ 26, 28, 31

Lee R. Raymond, *Energy – Key to growth and a better environment for Asia-Pacific nations*, World Petroleum Congress (Oct. 13, 1997) .................................................24

Letter from Dr. Patrick Michaels, Information Council on the Environment (May 15, 1991) .......................................26

Memo from A.M. Natkin to H.N. Weinberg re CRL/CO2 Greenhouse Program, Exxon Corporation (June 18, 1982) ......... 17, 18

Memo from Gregory J. Dana to AIAM Technical Committee re Global Climate Coalition (GCC) – Primer on Climate Change Science – Final Draft, Association of International Automobile Manufacturers (Jan. 18, 1996).................21

Memo from Henry Shaw to Dr. E.E. David, Jr. re "CO2
   Position Statement", Exxon Inter-Office Correspondence
   (May 15, 1981) ....................................................................................12

Memo from J.F. Black to F.G. Turpin re The Greenhouse
   Effect, Exxon Research and Engineering Company (June
   6, 1978).......................................................................................... 7, 8

Memo from M.B. Glaser to Exxon Management re CO2
   "Greenhouse" Effect, Exxon Research and Engineering
   Company (Nov. 12, 1982)............................................................. 10, 14

Memo from R. W. Cohen to A.M. Natkin, Exxon Research
   and Engineering Company (Sept. 2, 1982) ........................................13

Memo from R. W. Cohen to A.M. Natkin, Exxon Research
   and Engineering Company (Sept. 2, 1982) ........................................13

Memo from R.W. Cohen to W. Glass re possible
   "catastrophic" effect of CO2, Exxon Corporation (Aug. 18,
   1981)................................................................................................ 12, 13

Memo from W.L. Ferrall to R.L. Hirsch re "Controlling
   Atmospheric CO2", Exxon Research and Engineering
   Company (Oct. 16, 1979)...................................................................11

Mobil, *CNN and the value of instant replay*, New York Times
   (Oct. 16, 1997) ...................................................................................24

Mobil, *Op-Ed Impact Study: A Comparative Analysis of
   Energy Viewpoints in The Op-Ed Advertisements and The
   New York Times Editorials, 1970-1980*............................................25

P. Langcake, *The Enhanced Greenhouse Effect: A Review of
   the Scientific Aspects*, Shell Internationale Petroleum
   Maatschappij B.V., The Hague (Dec. 1994) ......................................19

R.P.W.M Jacobs, M.H. Griffiths, P.E. Bright, J.B. Homer,
   J.A.C.M. van Oudenhoven, and J. Waller, *The Greenhouse
   Effect*, Shell Internationale Petroleum Maatschappij B.V.,
   The Hague (May 1988) ......................................................................15

vi

Riley Dunlap and Aaron McCright, *Organized Climate Change Denial*, The Oxford Handbook of Climate Change and Society (2011) ...................................................................... 32

Roger Revelle and Hans Suess, *Carbon Dioxide Exchange Between Atmosphere and Ocean and the Question of an Increase of Atmospheric CO2 during the Past Decades*, 9 Tellus 18 (1957) ......................................................................... 4

Sally Brain Gentille, Willis E. Bush, Russel O. Jones, Thomas M. Kirlin, Barbara Moldauer, Edward D. Porter, and Garrett A. Vaughn, *Reinventing Energy: Making the Right Choices*, American Petroleum Institute (1996) ........................ 23

*Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis*, Center for International Environmental Law (Nov. 2017).............. 6, 7

Suzanne McCarron, *A Better Approach on Climate Change*, ExxonMobil (Jan. 10, 2018) ............................................................ 32

# CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Amicus Center for Climate Integrity certifies that it is an initiative within the Institute for Governance and Sustainable Development, a non-profit organization. Neither the Center for Climate Integrity nor the Institute has a parent corporation, and no publicly held company has any ownership of either. All other amici are private individuals and not corporations.

## IDENTITY AND INTEREST OF AMICUS CURIAE

Individual Amici are scholars and scientists with strong interests, education, and experience in the environment and the science of climate change, with particular interest in public information and communication about climate change and how the public and public leaders learn about and understand climate change.

**Dr. Naomi Oreskes** is Professor of the History of Science and Affiliated Professor of Earth and Planetary Sciences at Harvard. Professor Oreskes's research focuses on the earth and environmental sciences, with a particular interest in understanding scientific consensus and dissent. Her 2010 book, *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco to Global Warming*, co-authored with Erik M. Conway, was shortlisted for the Los Angeles Time Book Prize, and received the 2011 Watson-Davis Prize from the History of Science Society. She is a 2018-2019 Guggenheim Fellow. **Dr. Geoffrey Supran** is a Climate Change Solutions Fund Postdoctoral Fellow with Prof. Naomi Oreskes in the Department of History of Science at Harvard University, where he studies climate change communication with a particular focus on the

history of climate denial by fossil fuel interests. **Dr. Robert Brulle** is a Visiting Professor of Environment and Society at Brown University in Providence RI, and a Professor of Sociology and Environmental Science at Drexel University in Philadelphia. His research focuses on U.S. environmental politics, critical theory, and the political and cultural dynamics of climate change. **Dr. Justin Farrell** is an author and Professor in the School of Forestry and Environmental Science, the School of Management, and the Department of Sociology at Yale University. He studies environment, elites, misinformation, rural inequality, and social movements using a mixture of methods from large-scale computational text analysis, qualitative & ethnographic fieldwork, network science, and machine learning. **Dr. Benjamin Franta** is a J.D. Candidate at Stanford Law School and a Ph. D. Candidate in the Stanford University Department of History, where he studies the history of climate science and fossil fuel producers. He holds a separate Ph. D. in Applied Physics from Harvard University. **Stephan Lewandowsky** is a Professor and Chair in Cognitive Science at the University of Bristol. His research examines the potential conflict between human cognition and the physics of the global climate. In 2016,

3

he was appointed a fellow of the Committee for Skeptical Inquiry for his commitment to science, rational inquiry and public education.

**The Center for Climate Integrity** (CCI) is an initiative within the Institute for Governance and Sustainable Development, a non-profit organization. CCI's central goal is to accelerate corporate and governmental policy changes that speed the energy transition from fossil fuels to clean energy sources and that otherwise contribute to a safe climate.

Amici submit this brief because they understand that the conduct at the core of the Plaintiffs-Appellees' Complaint is that the Defendants affirmatively and knowingly concealed the hazards that they knew would result from the normal use of their fossil fuel products through misrepresentation about those products and deliberately discrediting scientific information related to climate change. As such it is critical to the ultimate outcome of these appeals that full documentation of these misrepresentations is available to the Court as it considers the arguments and claims made by Defendants-Appellants and their supporting amicus, the U.S. Chamber of Commerce.

4

5

All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing of submitting the brief, and no person other than amici or their counsel contributed money that was intended to fund preparing or submitting the brief.

# INTRODUCTION

At least fifty years ago, Defendants-Appellants (hereinafter, "Defendants") had information from their own internal research, as well as from the international scientific community, that the unabated extraction, production, promotion, and sale of their fossil fuel products would result in material dangers to the public. Defendants failed to disclose this information or take steps to protect the public. They also acted affirmatively to conceal their knowledge and discredit climate science, running misleading nationwide marketing campaigns and funding junk science to manufacture uncertainty, in direct contradiction to their own research and the actions they themselves took to protect their assets from climate change impacts such as sea level rise.

Defendants' coordinated, multi-front effort, demonstrated by their own documents and actions, fully justifies the state common law claims Plaintiffs-Appellees (hereinafter "Plaintiffs") have made. With respect to Plaintiffs' public nuisance claim, the critical question in determining liability is "whether the defendant created or assisted in the creation of the nuisance." *City of Modesto Redevelopment Agency v. Superior*

1

*Court*, 119 Cal. App. 4th 28, 38 (2004); *see also County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292, 306 (2006). In *Atlantic Richfield*, for example, the California Court of Appeals explained that liability is not based on a "defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition." 137 Cal. App. 4th at 309-10. In that case, as in others brought against producers or manufacturers under California nuisance law, the court found liability based on "defendants' promotion of [their product] with knowledge of the hazard that such use would create." *Id.* at 309; *see also People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 83-84 (2017); *City of Modesto v. Dow Chem. Co.*, 19 Cal. App. 5th 130, 155 (2018); *Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 66-67 & n.15 (1973).

As early as the late 1950s and no later than 1968, Defendants had actual knowledge of the risks associated with their fossil fuel products. It cannot be said that Defendants, in the decades that would follow, did nothing with this knowledge. They took proactive steps to conceal this information, sow uncertainty, and fund bought-and-paid-for "science" to promote alternative theories. And, while they told the world there was

nothing to worry about, Defendants took their climate science into account in managing their infrastructure, for example, raising the level of their oil rigs to account for rising sea levels. In doing so, Defendants created or assisted in creating the nuisance Plaintiffs allege, and therefore should be held liable.

## I. DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE RISKS ASSOCIATED WITH THEIR FOSSIL FUEL PRODUCTS

### A. Defendants had early knowledge that fossil fuel products were causing an increase in atmospheric $CO_2$ concentrations, and that this increase could result in "catastrophic" consequences.

Defendants knew decades ago of the potential risks associated with their products, independently and through their membership and involvement in trade associations such as American Petroleum Institute (API), American Fuel & Petrochemical Manufacturers, and Western States Petroleum Association.

API and its members were aware of research on carbon as early as 1954. At that time, Harrison Brown and other scientists at the California Institute of Technology measured and assessed increased

$CO_2$ concentrations in the atmosphere.[1]  Although the results were not published, API and other researchers within the petroleum industry were aware of this research.[2]  In 1957, Roger Revelle and Hans Suess at the Scripps Institute of Oceanography published a paper, in which they predicted large increases in atmospheric $CO_2$ if fossil fuel production continued unabated.[3]  Shortly after, H.R. Brannon of Humble Oil (now ExxonMobil) published research on the same question, the conclusions of which were consistent with Brown's findings: increased fossil fuel combustion increased atmospheric $CO_2$.[4]

In 1959, physicist Edward Teller delivered the first warning of the dangers of global warming to the petroleum industry, at a symposium held at Columbia University to celebrate the 100th anniversary of the

---

[1] Benjamin Franta, *Early oil industry knowledge of $CO_2$ and global warming*, 8 Nature Climate Change 1024 (Nov. 19, 2018), https://www.nature.com/articles/s41558-018-0349-9.

[2] *Id.*

[3] Roger Revelle and Hans Suess, *Carbon Dioxide Exchange Between Atmosphere and Ocean and the Question of an Increase of Atmospheric $CO_2$ during the Past Decades*, 9 Tellus 18 (1957), http://www.tandfonline.com/doi/pdf/10.3402/tellusa.v9i1.9075?needAccess=true.

[4] H.R. Brannon, A.C. Daughtry, D. Perry, W.W. Whitaker, and M. Williams, *Radiocarbon evidence on the dilution of atmospheric and oceanic carbon by carbon from fossil fuels*, 38 Trans. Am. Geophys. Union 643 (Oct. 1957).

industry.  Teller described the need to find energy sources other than fossil fuels to mitigate these dangers, stating, "a temperature rise corresponding to a 10 per cent increase in carbon dioxide will be sufficient to melt the icecap and submerge New York.  All the coastal cities would be covered, and since a considerable percentage of the human race lives in coastal regions, I think that this chemical contamination is more serious than most people tend to believe."[5]

Then in 1965, API President Frank Ikard delivered a presentation at the organization's annual meeting.  Ikard informed API's membership that President Johnson's Science Advisory Committee had predicted that fossil fuels would cause significant global warming by the end of the century.[6]  He issued the following warning about the consequences of $CO_2$ pollution to industry leaders:

> This report unquestionably will fan emotions, raise fears, and bring demands for action.  The substance of the report is that there is still time to save the world's peoples from the

---

[5] Edward Teller, *Energy patterns of the future*, 38 Energy and Man: A Symposium 53, 58 (1960).

[6] Frank Ikard, *Meeting the challenges of 1966*, Proceedings of the American Petroleum Institute 12-15 (1965), http://www.climatefiles.com/trade-group/american-petroleum-institute/1965-api-president-meeting-the-challenges-of-1966/.

catastrophic consequence of pollution, but time is running out.[7]

Over the next few years, scientific research continued to bolster the conclusion that the combustion of fossil fuels was the primary driver of climate change. For example, the Stanford Research Institute (SRI) report commissioned by API and distributed to its board members and made available to API's members, warned that "rising levels of $CO_2$ would likely result in rising global temperatures and that, if temperatures increased significantly, the result could be melting ice caps, rising sea levels, warming oceans, and serious environmental damage on a global scale."[8] The scientists acknowledged that burning of fossil fuels provided the best explanation for an increase in $CO_2$.[9]

In 1969, API commissioned a supplemental report by SRI that provided a more detailed assessment on $CO_2$. The report stated that: atmospheric concentrations of $CO_2$ were steadily increasing; 90% of this

---

[7] *Id.* at 13.

[8] *Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis*, Center for International Environmental Law 12 (Nov. 2017), https://www.ciel.org/wp-content/uploads/2017/11/Smoke-Fumes-FINAL.pdf.

[9] Elmer Robinson and R.C. Robbins, *Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants*, Stanford Research Institute 3 (1968), https://www.smokeandfumes.org/documents/document16.

increase could be attributed to fossil fuel combustion; and continued use of fossil fuels would result in further increases of $CO_2$ levels in the atmosphere.[10] The report projected that based on current fuel usage, atmospheric $CO_2$ concentrations would reach 370 ppm by 2000—exactly what it turned out to be.[11] All of this research was summarized and shared with API members, including Defendants.[12]

A 1977 presentation and 1978 briefing by senior Exxon scientist James F. Black warned the Exxon Corporation Management Committee that $CO_2$ concentrations were building in the Earth's atmosphere at an increasing rate, that $CO_2$ emissions were attributable to fossil fuels, and that $CO_2$ was contributing to global warming.[13] Speaking to the emerging scientific consensus on climate change at the time, Black acknowledged that there was general scientific agreement that carbon

---

[10] *Smoke and Fumes, supra* note 8, at 12.

[11] *Global Mean $CO_2$ Mixing Ratios (ppm): Observations*, NASA Goddard Institute for Space Studies, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt (last visited Jan. 25, 2019).

[12] *Environmental Research, A Status Report*, American Petroleum Institute (Jan. 1972), http://files.eric.ed.gov/fulltext/ED066339.pdf.

[13] Memo from J.F. Black to F.G. Turpin re The Greenhouse Effect, Exxon Research and Engineering Company 3 (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxon-corporation-management-committee/.

dioxide released from the burning of fossil fuels was likely influencing global climate, and stated:

> Present thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical.[14]

Black expressed no uncertainty as to whether climate change was real and caused by burning of fossil fuels. Former Exxon scientist, Ed Garvey, described the situation as follows: "By the late 1970s, global warming was no longer speculative."[15] As Garvey explained during an interview in 2018, "The issue was not were we going to have a problem, the issue was simply how soon and how fast and how bad was it going to be. Not if."[16]

In sum, through the 1950s, 1960s, and 1970s, the science showed, unequivocally, that fossil fuels were driving climate change. Not only

---

[14] *Id.* at 3.

[15] James Osborne, *INTERVIEW: Former Exxon scientist on oil giant's 1970s climate change research*, Dallas News (Oct. 2015), https://www.dallasnews.com/business/business/2015/10/02/interview-former-exxon-scientist-on-oil-giants-1970s-climate-change-research.

[16] Amy Westervelt, *Drilled: A True Crime Podcast about Climate Change*, Episode 1, The Bell Labs of Energy (interview with Ed Garvey at 11:10) (Nov. 14, 2018), https://www.criticalfrequency.org/drilled.

did the science make clear the link between $CO_2$ emissions and global warming, Defendants had knowledge of this scientific consensus.

### B. Defendants conducted their own climate science research that confirmed fossil fuels were increasing atmospheric carbon dioxide and affecting the climate.

From the late 1970s through early 1980s, Defendants repeatedly confirmed the science of climate change with their own research.[17]

Exxon, in particular, became a leader in the growing field of climate science. Following Black's and others' warnings, Exxon launched an ambitious research program to study the environmental effects of greenhouse gases and their impacts. The company assembled a team of scientists, modelers, and mathematicians that spent more than a decade deepening the company's understanding of an environmental problem that posed an existential threat to its business interests.[18] As Exxon senior scientist Morrel Cohen explained: "Exxon

---

[17] Between 1983-84, Exxon's researchers published their results in at least three peer-reviewed papers in the *Journal of the Atmospheric Sciences* and *American Geophysical Union*. A list of "Exxon Mobil Contributed Publications" from 1983-2014 is available at: https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/climate_peer_reviewed_publications_1980s_forward.pdf.

[18] Geoffrey Supran and Naomi Oreskes, *Assessing ExxonMobil's climate change communications (1977–2014)*, 12(8) Environmental Research

was trying to become a research power in the energy industry the way the Bell Labs was in the communications industry."[19]  The research program included both empirical $CO_2$ sampling and rigorous climate modeling, and was perceived by those within the company and industry as being on the cutting edge of research into what was then known as the "greenhouse effect." By 1982, Exxon's scientists, in collaboration with other industry scientists, had created powerful climate models that confirmed the scientific consensus that the continued increase of $CO_2$ from fossil fuels would cause significant global warming by the middle of the 21st century with "potentially catastrophic" effects, and communicated these findings internally.[20]

In 1979, W.L. Ferrall described the findings of an internal Exxon study a concluding that the "increase [in $CO_2$ concentration] is due to

Letters 084019 (Aug. 23, 2017), http://iopscience.iop.org/article/10.1088/1748-9326/aa815f.

[19] Westervelt, *supra* note 16 (interview with Morrell Cohen at 6:21); *see also* John Walsh, *Exxon Builds on Basic Research*, 225 Science 1001 (1984), https://www.documentcloud.org/documents/5690867-1984-Walsh-Exxon-Builds-on-Basic-Reseach.html.

[20] *See e.g.* Memo from M.B. Glaser to Exxon Management re $CO_2$ "Greenhouse" Effect, Exxon Research and Engineering Company 11 (Nov. 12, 1982), http://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.

fossil fuel combustion[, i]ncreasing $CO_2$ concentration will cause a warming of the earth's surface[, and t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050."[21]  With a doubling of $CO_2$ concentration (using 1860 as a baseline), Ferrall predicted that "ocean levels would rise four feet" and the "Arctic Ocean would be ice free for at least six months each year, causing major shifts in weather patterns in the northern hemisphere."[22]

A 1980 presentation by Dr. John Laurman to the API Task Force on "The $CO_2$ Problem" identified the "scientific consensus on the potential for large future climatic response to increased $CO_2$ levels" as a reason for concern, and stated that there was "strong empirical evidence" that climate change was caused by fossil fuel combustion.[23] Laurman also warned the API Task Force that foreseeable temperature

---

[21] Memo from W.L. Ferrall to R.L. Hirsch re "Controlling Atmospheric $CO_2$", Exxon Research and Engineering Company 1 (Oct. 16, 1979), http://insideclimatenews.org/sites/default/files/documents/CO2%20and%20Fuel%20Use%20Projections.pdf.

[22] *Id.*, Appendix A at 1.

[23] *AQ-9 Task Force Meeting Minutes*, American Petroleum Institute, Attachment B at 1-2 (Mar. 18, 1980), https://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf.

11

increases could have "major economic consequences" and "globally

catastrophic effects."[24]

By 1981, Exxon had internally acknowledged the risks of climate

change and the role fossil fuel combustion played in increasing $CO_2$

concentrations in the atmosphere. In an internal memorandum

outlining Exxon's position on the $CO_2$ greenhouse effect, Exxon scientist

Henry Shaw wrote that a doubling of $CO_2$ would result in 3°C increase

in average global temperature and 10°C increase at the poles, causing

major shifts in rainfall/agriculture, and melting of polar ice.[25] Also in

1981, Roger Cohen, director of Exxon's Theoretical and Mathematical

Sciences Laboratory, warned about the magnitude of climate change:

"we will unambiguously recognize the threat by the year 2000 because

of advances in climate modeling and the beginning of real experimental

confirmation of the $CO_2$ effect."[26] He stated: "it is distinctly possible

---

[24] *Id.*, Attachment B at 5.

[25] Memo from Henry Shaw to Dr. E.E. David, Jr. re "$CO_2$ Position Statement", Exxon Inter-Office Correspondence 2 (May 15, 1981), https://insideclimatenews.org/sites/default/files/documents/Exxon%20Position%20on%20CO2%20%281981%29.pdf.

[26] Memo from R.W. Cohen to W. Glass re possible "catastrophic" effect of $CO_2$, Exxon Corporation 1 (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.

that [Exxon Planning Division's] scenario will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[27]

In 1982, Cohen summarized the findings of Exxon's research in climate modeling, stating that "over the past several years *a clear scientific consensus has emerged* regarding the expected climatic effects of increased atmospheric $CO_2$." (emphasis added)[28]  Cohen acknowledged that Exxon shared the views of the mainstream science community, stating that there is "unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate," and that Exxon's findings were "consistent with the published predictions of more complex climate models" and "in accord with the scientific consensus on the effect of increased atmospheric $CO_2$ on climate."[29]

---

[27] *Id.*

[28] Memo from R. W. Cohen to A.M. Natkin, Exxon Research and Engineering Company 1 (Sept. 2, 1982), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research/.

[29] *Id.* at 2.

13

Industry documents from the 1980s provide further evidence that Exxon and other Defendants internally acknowledged that climate change was real, it was caused by fossil fuel consumption, and it would have significant impacts on the environment and human health. Notably, a 1982 corporate primer—circulated internally to Exxon management—recognized the need for "major reductions in fossil fuel combustion" as a means to mitigate global warming. In the absence of such reductions, "there are some potentially catastrophic events that must be considered . . . [O]nce the effects are measurable, they might not be reversible . . ."[30]

The 1982 Exxon primer predicted a doubling of $CO_2$ concentrations (above pre-industrial levels) by 2060 and increased temperatures of 2-4 degrees Celsius (above 1982 levels) by the end of the 21st century. It also provided a detailed assessment of the "potentially catastrophic" impacts of global warming, including primary impacts on physical and biological systems and secondary impacts (e.g. migration, famine).

---

[30] Memo from M.B. Glaser to Exxon Management re $CO_2$ "Greenhouse" Effect, *supra* note 20, at 2 and 11.

14

A 1988 report by Shell's Greenhouse Effect Working Group issued similar warnings to those of Exxon: "Man-made carbon dioxide, released into and accumulated in the atmosphere, is believed to warm the earth through the so-called greenhouse effect."[31] The report stated that "by the time the global warming becomes detectable it could be too late to take effective countermeasures to reduce the effects or even to stabilise the situation."[32] Acknowledging the need to consider policy changes, the report provided that "the potential implications for the world are . . . so large that policy options need to be considered much earlier" and that research should be "directed more to the analysis of policy and energy options than to studies of what we will be facing exactly."[33]

The Shell report made detailed predictions of the harmful impacts of global warming. It noted that warming could cause the melting of the West Antarctic Ice Sheet, which in turn could result in sea level rise

---

[31] R.P.W.M Jacobs, M.H. Griffiths, P.E. Bright, J.B. Homer, J.A.C.M. van Oudenhoven, and J. Waller, *The Greenhouse Effect*, Shell Internationale Petroleum Maatschappij B.V., The Hague 1 (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

[32] *Id.*

[33] *Id.*

of 5-6 meters.  It also predicted the "disappearance of specific ecosystems or habitat destruction," an increase in "runoff, destructive floods, and inundation of low-lying farmland," and the need for new sources of freshwater to compensate for changes in precipitation.  The report forecasted that changes in global atmospheric temperature would "drastically change the way people live and work."[34]

In the 1970s and 1980s, Defendants pursued cutting-edge research and amassed considerable data on climate change.  Their own research and data confirmed their earlier knowledge and led to the undeniable conclusion that continuing to expand fossil fuel use would lead to irreversible and catastrophic climate change.  With this certainty, Defendants in the early 1980s were at a turning point.

## II. DEFENDANTS TOOK PROACTIVE STEPS TO CONCEAL THEIR KNOWLEDGE AND DISCREDIT CLIMATE SCIENCE

But at this turning point, and despite acknowledging that an increasing level of atmospheric $CO_2$ is causing considerable concern due

---

[34] Benjamin Franta, *Shell and Exxon's secret 1980s climate change warnings*, The Guardian (Sept. 19, 2018, 6:00am), https://www.theguardian.com/environment/climate-consensus-97-per-cent/2018/sep/19/shell-and-exxons-secret-1980s-climate-change-warnings (citing The Greenhouse Effect, Shell International).

16

to potential climate effects, Exxon and the other Defendants decided not to take steps to prevent the risks of climate change. Instead, they stopped funding climate research, and began a campaign to discredit climate science and delay actions perceived as contrary to their business interests.[35] Defendants proactively engaged in multiple steps to carry out this campaign: (1) developing internal policies and strategies in contradiction of their knowledge and science, (2) disseminating public communications designed to manufacture doubt and minimize the risks of climate change; and (3) funding organizations and research that discredited the growing body of publicly available climate science.

As a result, many of the dire predictions Defendants' own scientists made in the 1950s through the 1970s have come to pass.

### A. Defendants developed sophisticated strategies to hide the risks of climate change and create doubt about the scientific consensus of global warming.

Defendants developed internal strategies and policies to hide the risks of climate change. Following Exxon's lead, the fossil fuel industry

---

[35] Memo from A.M. Natkin to H.N. Weinberg re CRL/$CO_2$ Greenhouse Program, Exxon Corporation 1 (June 18, 1982), http://insideclimatenews.org/sites/default/files/documents/Budget%20Cutting%20Memo%20(1982).pdf.

17

responded to public policy efforts to address the dangers of its products by denying and concealing the known hazards, in contradiction to earlier positions and statements made by industry scientists and executives. The internal memoranda and statements described below demonstrate this marked shift in the industry's position on climate science.

Exxon, in a 1988 internal memo on the Greenhouse Effect, acknowledged that atmospheric $CO_2$ concentrations were increasing and could double in 100 years, that the combustion of fossil fuels emits five billion gigatons of $CO_2$ per year, and that the "[g]reenhouse effect may be one of the most significant environmental issues for the 1990s."[36] But in this same memo, Exxon identified that its position would be to "[e]mphasize the uncertainty in scientific conclusions regarding the potential enhanced Greenhouse effect[.]"[37]

Shell, as evidenced by an 1994 internal report titled "The Enhanced Greenhouse Effect: A Review of the Scientific Aspects," followed suit with Exxon in the strategy of emphasizing uncertainty in

---

[36] *Id.* at 2.
[37] *Id.* at 7.

18

climate science. In contrast to Shell's 1988 report that recommended the consideration of policy solutions early on, the 1994 report pivoted to the theme of scientific uncertainty, noting that "the postulated link between any observed temperature rise and human activities has to be seen in relation to natural variability, which is still largely unpredictable." Shell also promoted policy delay, asserting that "[s]cientific uncertainty and the evolution of energy systems indicate that policies to curb greenhouse gas emissions beyond 'no regrets' measures could be premature, divert resources from more pressing needs and further distort markets."[38]

Industry associations and groups, such as the Global Climate Coalition (GCC), took similar positions. Established in 1989, the GCC identified itself as "an organization of business trade associations and private companies . . . to coordinate business participation in the

---

[38] P. Langcake, *The Enhanced Greenhouse Effect: A Review of the Scientific Aspects*, Shell Internationale Petroleum Maatschappij B.V., The Hague (Dec. 1994), https://www.documentcloud.org/documents/4411099-Document11.html#document/p15/a411511.

19

scientific and policy debate on global climate change issue"[39]—but in effect, the group opposed greenhouse gas regulation through lobbying, funding of front groups, the spread of denial and disinformation, and other tactics. The GCC's members included the National Association of Manufacturers, American Petroleum Institute, and several fossil fuel companies.

In 1996, following publication of the Intergovernmental Panel on Climate Change's Second Assessment Report, the GCC developed a primer that provided an overview of the group's position on climate change. While acknowledging that global warming was happening, the GCC claimed that there was significant uncertainty as to the cause of warming:

> The GCC believes that the preponderance of the evidence indicates that most, if not all, of the observed warming is part of a natural warming trend which began approximately 400 years ago. If there is an anthropogenic component to this observed warming, the GCC believes that it must be very small and must be superimposed on a much larger natural warming trend.[40]

---

[39] *Global Climate Coalition: An Overview*, Global Climate Coalition 1 (Nov. 1996), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1996-global-climate-coalition-overview/.

[40] *Id.* at 2.

This statement not only stands in contradiction to the large number of internal memos and peer-reviewed papers published by Defendants' own scientists but also to the final internal draft of the GCC primer, which stated that the "scientific basis for the Greenhouse Effect and the potential impacts of human emissions of greenhouse gases such as $CO_2$ on climate is well established and cannot be denied."[41]  This language was removed before final publication.  The final internal draft also included a section discussing how contrarian theories failed to "offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change."[42]  This section was also removed by the GCC before final publication.

As their memoranda and statements show, Defendants—knowing the continued expansion of fossil fuel use represented a turning point

---

[41] Memo from Gregory J. Dana to AIAM Technical Committee re Global Climate Coalition (GCC) – Primer on Climate Change Science – Final Draft, Association of International Automobile Manufacturers 5 (Jan. 18, 1996), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/global-climate-coalition-draft-primer/.

[42] Memo from Gregory J. Dana to AIAM Technical Committee re Global Climate Coalition (GCC) – Primer on Climate Change Science – Final Draft, *supra* note 41.

for the global climate—undertook a deliberate shift away from their prior research efforts to the strategy of uncertainty and delay.

**B.    Defendants engaged in public communications campaigns designed to manufacture doubt and minimize the risks of climate change.**

Communications efforts aimed at the general public were, and continue to be, a key part of Defendants' strategy.  Defendants disseminated numerous publications and advertisements that directly contradicted earlier statements that recognized a general consensus on climate change and the magnitude of its effects.

For example, in 1996, Exxon issued a publication titled "Global warming: who's right? Facts about a debate that's turned up more questions than answers," in which Exxon CEO Lee Raymond stated that "taking drastic action immediately is unnecessary since many scientists agree there's ample time to better understand climate systems . . ."  The publication characterized the greenhouse effect as "unquestionably real and definitely a good thing," and as "what makes the earth's atmosphere livable."  Directly contradicting the company's decades of internal reports and peer-reviewed science, the publication attributed the increase in global temperature to "natural fluctuations

22

that occur over long periods of time" rather than to anthropogenic sources.[43]

Also in 1996, API published a book titled "Reinventing Energy: Making the Right Choices," which stated that "there is no persuasive basis for forcing Americans to dramatically change their lifestyles to use less oil." The book denied the human connection to climate change, stating that no "scientific evidence exists that human activities are significantly affecting sea levels, rainfall, surface temperatures or the intensity and frequency of storms."[44] In 1997, Exxon CEO Lee Raymond expressed support for these views. In a speech presented at the World Petroleum Congress at which many of the Defendants were present, Raymond presented a false dichotomy between stable energy

---

[43] *Global warming: who's right? Facts about a debate that's turned up more questions than answers*, Exxon Corporation 5 (1996), http://www.climatefiles.com/exxonmobil/global-warming-who-is-right-1996/.

[44] Sally Brain Gentille, Willis E. Bush, Russel O. Jones, Thomas M. Kirlin, Barbara Moldauer, Edward D. Porter, and Garrett A. Vaughn, *Reinventing Energy: Making the Right Choices*, American Petroleum Institute 77 (1996), http://www.climatefiles.com/trade-group/american-petroleum-institute/1996-reinventing-energy/.

markets and reduction in the marketing, promotion and sale of fossil fuel products known to Defendants to be hazardous.[45]

In addition to these public statements, Defendants developed, implemented and/or funded public affairs programs, aiming to shift "America's social consciousness" by targeting specific people or groups of people with messages designed for them.[46] From 1972 through 2014, Mobil and ExxonMobil ran advertorials (paid advertisements that were styled like editorials and placed on the Op-Ed page) in *The New York Times*,[47] some of which were intended to allow the "public to know where [they] stand" on climate change and other issues.[48] In an internal assessment of the impacts of its advertorials, Mobil concluded that the *Times* had "altered or significantly softened its viewpoints on:

---

[45] Lee R. Raymond, *Energy – Key to growth and a better environment for Asia-Pacific nations*, World Petroleum Congress 5 (Oct. 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf.

[46] *See e.g. Evolution of Mobil's Public Affairs Programs 1970-81*, Mobil 2, https://www.documentcloud.org/documents/5396414-Reduced-Evolution-of-Mobil-Public-Affairs-Program.html (last visited Jan. 25, 2019).

[47] *Exxon and Mobil Ads*, Polluter Watch, http://polluterwatch.org/exxon-and-mobil-ads (last visited Jan. 25, 2019).

[48] Mobil, *CNN and the value of instant replay*, New York Times (Oct. 16, 1997), http://www.documentcloud.org/documents/705559-mob-nyt-1997-oct-16-cnnslam.html.

conservation; monopoly and divestiture; decontrol; natural gas; coal; offshore drilling; and gasohol."[49]

Amici Dr. Supran and Dr. Orestes compared ExxonMobil's internal and peer-reviewed scientific papers to its external public communications (including thirty-six *Times* advertorials from 1989 to 2004) found a stark contrast between the way that the two sets of documents characterized climate change, strongly suggesting that company leadership was aware of its responsibility for climate change, even as it denied in public that the problem was real. Dr. Supran and Dr. Orestes found that 83% of peer-reviewed papers and 80% of internal documents acknowledge that climate change is real and human-caused, yet only 12% of advertorials do so, with 81% instead expressing doubt.[50]

Similarly, an industry-funded organization called the Information Council on the Environment (ICE) launched a national climate change denial campaign with print and radio advertisements, designed to discredit climate science and cherry-pick the data in order to confuse

---

[49] Mobil, *Op-Ed Impact Study: A Comparative Analysis of Energy Viewpoints in The Op-Ed Advertisements and The New York Times Editorials, 1970-1980* (on file).
[50] Supran and Oreskes, *supra* note 18, at 1.

the public and promote uncertainty (ICE was formed and supported by affiliates, predecessors and/or subsidiaries of Defendants).[51]  ICE's primary strategy was to "reposition global warming as theory (not fact),"[52] a clear acknowledgement that global warming had previously been positioned and accepted as fact within the scientific community.

In 1996, API created the Global Climate Science Communications Team (GCSCT), a small group of prominent representatives of fossil fuel companies, public relations firms, and industry front groups with the mission of undermining the global scientific consensus that climate change was real and human caused.  In 1998, after the Kyoto Protocol was signed, the GCSCT developed a plan to launch a multi-million-

---

[51] Among others, members included:  Western Fuels Association, National Coal Association, Edison Electric Institute, Island Creek Coal Company (subsidiary of Occidental Petroleum), Peabody Coal Company, and Pittsburgh and Midway Coal Mining (subsidiary of Chevron).  Kathy Mulvey and Seth Shulman, *The Climate Deception Dossiers: Internal Fossil Fuel Industry Memos Reveal Decades of Corporate Disinformation* at 22, Union of Concerned Scientists 21 (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf.

[52] Letter from Dr. Patrick Michaels, Information Council on the Environment 9 (May 15, 1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

26

dollar, multi-year "national media relations program to inform the media about uncertainties in climate science; to generate national, regional and local media on the scientific uncertainties, and thereby educate and inform the public, stimulating them to raise questions with policymakers."[53]

The largest budget item in the plan ($5,000,000 over two years minimum) was for the Global Climate Science Data Center, which was intended to be a "one-stop resource on climate science for members of Congress, the media, industry and all others concerned."[54]  Although no group with this name was ever formed, the proposal—in which the fossil fuel industry sought to establish a think tank that would appear independent but in reality would promote industry positions within scientific and policy communities—likely prompted the creation of other groups, such as the Center for the Study of Carbon Dioxide and Global Change.  As a means to influence public opinion, the GCSCT aimed to

---

[53] *Global Climate Science Communications Team Action Plan*, American Petroleum Institute 4 (Apr. 3, 1998), http://www.climatefiles.com/trade-group/american-petroleum-institute/1998-global-climate-science-communications-team-action-plan/.
[54] *Id.* at 5-6.

27

"identify, recruit and train a team of five independent scientists to participate in media outreach"—and in doing so, the team recognized the need to conceal these financial ties to ensure the scientists' credibility with the public.[55]

In sharp contrast to findings that the industry's own scientists had published for more than two decades in peer-reviewed literature, the API strategy memo laying out details of this plan declared that "it not [sic] known for sure whether (a) climate change actually is occurring, or (b) if it is, whether humans really have any influence on it."[56] The memo articulated the association's intent to undermine the scientific consensus on climate change, stating that API would declare victory when:

- Average citizens "understand" (recognize) uncertainties in climate science; recognition of uncertainties becomes part of the "conventional wisdom."

- Media "understands" (recognizes) uncertainties in climate science.

- Media coverage reflects balance on climate science and recognition of the validity of viewpoints that challenge the current "conventional wisdom."

---

[55] Mulvey and Shulman, *supra* note 51, at 10-11.
[56] *Global Climate Science Communications Team Action Plan, supra* note 53, at 1.

- Industry senior leadership understand uncertainties in climate science, making them stronger ambassadors to those who shape climate policy.

- Those promoting the Kyoto treaty on the basis of extant science appear to be out of touch with reality.[57]

Exxon, Chevron, and API contributed to the development of the plan through their representatives Randy Randol, Sharon Kneiss, and Joseph Walker, respectively. Exxon, Chevron, and Occidental Petroleum also exerted influence through Steve Milloy, the executive director of a front group called The Advancement of Sound Science Coalition, which was funded in part by these companies. The roadmap further identified an array of industry trade associations and front groups, fossil fuel companies, and free-market think tanks that would underwrite and execute the plan, including: API and its members; Business Round Table and its members; Edison Electric Institute and its members; Independent Petroleum Association of America and its members; National Mining Association and its members; American Legislative Exchange Council; Committee for a Constructive Tomorrow; Competitive Enterprise Institute; Frontiers of Freedom; and the George C. Marshall Institute.

---

[57] *Id.* at 3.

29

**C.  Defendants funded organizations and research to discredit the growing body of publicly available climate science.**

As Martin Hoffert, an Exxon scientist for more than twenty years and author/co-author of several of Exxon's peer-reviewed papers on the $CO_2$ greenhouse effect, said, "Even though we were writing all these papers which were basically supporting the idea that climate change from $CO_2$ emissions was going to change the climate of the earth according to our best scientific understanding, the front office which was concerned with promoting the products of the company was also supporting people that we call climate change deniers… they were giving millions of dollars to other entities to support the idea that the $CO_2$ greenhouse was a hoax."[58]

Defendants advanced these denial arguments and alternative theories as a means to create uncertainty and undermine climate science.  For example, ExxonMobil, API, Southern Company, and other fossil fuel interests funded Dr. Wei-Hock Soon to publish and aggressively promote research asserting that solar variability is the

---

[58] Dick Russell and Robert F. Kennedy, Jr., *Horsemen of the Apocalypse: The Men Who Are Destroying the Planet* at 20 (Hot Books 2017).

primary cause of global warming, even though the GCC had dismissed this theory as "unconvincing" in its primer. Between 2001 and 2012, Soon received more than $1.2 million from the fossil fuel industry, including Defendants, to conduct research purported to be independent and to promote climate change theories that Defendants knew were not supported by the peer-reviewed scientific literature, including publications by their own scientists.[59]

In addition to providing funding to scientists to promote invalid theories, Defendants funded industry front groups that aggressively denied and sought to discredit climate science. From 1998 through 2017, ExxonMobil alone spent $36 million funding 69 organizations that misrepresented and persistently sought to discredit the scientific consensus that Defendants' fossil fuel products were causing climate change.[60]

---

[59] Mulvey and Shulman, *supra* note 51, at 6.

[60] *ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist Organizations*, UCS (2017), https://www.ucsusa.org/sites/default/files/attach/2019/ExxonMobil-Worldwide-Giving-1998-2017.pdf?_ga=2.84739161.1384563456.1548170682-1610477837.1510330963.

31

In 2007, ExxonMobil pledged to stop funding climate denier groups: "In 2008, we will discontinue contributions to several public policy research groups whose position on climate change could divert attention from the important discussion on how the world will secure the energy required for economic growth in an environmentally responsible manner."[61]

In direct contradiction of this public statement and more recent ones acknowledging that the "risk of climate change is real and [Exxon is] committed to being part of the solution,"[62] the company continued to fund individuals like Dr. Soon, as well as groups that spread misinformation on climate science or obstructed policy efforts to address global warming.[63]  From 2008 through 2017, ExxonMobil spent $13 million funding think tanks and lobby groups that reject established climate science, spread misinformation, and openly oppose the

---

[61] *2007 Corporate Citizenship Report*, ExxonMobil 39 (2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.

[62] Suzanne McCarron, *A Better Approach on Climate Change*, ExxonMobil (Jan. 10, 2018), https://energyfactor.exxonmobil.com/perspectives/better-approach-climate-change/.

[63] See Riley Dunlap and Aaron McCright, *Organized Climate Change Denial*, The Oxford Handbook of Climate Change and Society (2011).

company's public positions on climate policy,[64] a clear indication that ExxonMobil continues to fund climate science misinformation through third-party organizations to this day.

## III. DEFENDANTS MOVED TO PROTECT THEIR OWN ASSETS FROM CLIMATE IMPACTS BASED ON THE SCIENCE THEY PUBLICLY DISCREDITED

While running campaigns to establish uncertainty of climate science and risks and to block regulatory action on climate change, Defendants took affirmative steps to protect their own assets from climate risks through internal research, infrastructure improvements, and plans to exploit new reserves in a warming world. As described below, Defendants took climate risks into account in the planning and construction of major engineering and infrastructure projects, all while concealing and denying the hazards of their products in the public sphere.

In 1989, Shell announced that its engineers were redesigning a $3 billion North Sea natural gas offshore platform to protect against sea

---

[64] *ExxonMobil Foundation & Corporate Giving to Climate Change Denier & Obstructionist Organizations, supra* note 61.

level rise.[65] The company's Norwegian subsidiary, Norske Shell, had been planning to build a 1.5 million metric ton structure that would stand in more than 300 meters of water and rise 30 meters above the surface, but the engineers questioned what the effect of sea level rise might be. As a result, the engineers considered raising the height to 31 or 32 meters, with a one-meter increase estimated at an additional $16 million and a two-meter increase roughly double that amount (estimated to be about 1% of the project's total cost).[66]

By the mid-1990s, efforts by Exxon and other Defendants, described above, to deny and discredit the scientific consensus on climate change were reaching maturity, with millions of dollars per year being paid to scientists and front groups to assert that climate change was not real, that fossil fuels had nothing to do with any temperature increases that were being observed, and that a variety of theories that the Defendants knew were not valid were responsible for

---

[65] Amy Lieberman and Susanne Rust, *Big Oil braced for global warming while it fought regulations*, Los Angeles Times (Dec. 31, 2015), http://graphics.latimes.com/oil-operations/.

[66] *Greenhouse Effect: Shell Anticipates A Sea Chang*e, New York Times (Dec. 20, 1989), https://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html.

34

the warming that was confirmed by every independent scientific authority in the world.

Yet in 1994, when planning the Europipe project jointly owned and operated by Shell, Exxon, Conoco, Total and Statoil, the companies took sea level rise and other climate impacts into account in the design of the natural gas pipeline leading from a North Sea offshore platform to the German coast. In a document submitted to European authorities, the companies noted the impacts of sea level rise and likely increase in frequency of storms as a result of climate change. While recognizing climate change as a "most uncertain parameter," they determined that the pipeline should be designed to account for climate impacts.[67]

In 1996, Mobil, Shell, and Imperial Oil (now majority owned by ExxonMobil) took similar steps to protect their joint investments in the Sable gas field project. Company engineers designed and built a "collection of exploration and production facilities along the Nova Scotia coast that made structural allowances for rising temperatures and sea levels."[68] As described in the design specifications, "[a]n estimated rise

---

[67] Lieberman and Rust, *supra* note 69.
[68] *Id.*

35

in water level, due to global warming, of 0.5 meters may be assumed" for the 25-year life of the Sable gas field project.[69]

## IV.   CONCLUSION

Defendants had actual knowledge of the potential risks associated with their fossil fuel products as early as the late 1950s and no later than 1968.  Yet, despite this knowledge and expertise on climate science, Defendants affirmatively promoted the use of their products through various means.  Defendants thus created or assisted in creating the nuisance alleged by Plaintiffs and therefore should be held liable under California state law.  Amici urge this Court to uphold the decision below and confirm that Plaintiffs' claims should proceed in state court.

RESPECTFULLY SUBMITTED this 29th day of January, 2019.

By:  *s/ Daniel Mensher*
KELLER ROHRBACK L.L.P.
Daniel P. Mensher
Alison S. Gaffney
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900

*Counsel for Amici Curiae*

---

[69] *Id.*

# CERTIFICATE OF COMPLIANCE

9th Cir. Case Number(s) 18-15499, 18-15502, 18-15503, 18-16376

I am the attorney or self-represented party.

This brief contains **6,994 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

*s/ Daniel Mensher*
Daniel Mensher

# CERTIFICATE OF SERVICE

**9th Cir. Case Number(s)** 18-15499, 18-15502, 18-15503, 18-16376

I hereby certify that I electronically filed the foregoing/attached **Brief of Amici Curiae Robert Brule, Center For Climate Integrity, Justin Farrell, Benjamin Franta, Stephan Lewandowsky, Naomi Oreskes, And Geoffrey Supran in Support of Appellees and Affirmance** on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

*s/ Daniel Mensher*
Daniel Mensher

38